## FRAZER and others *vs.* WESTERN and others.

The law sanctions a conveyance founded upon the consideration of blood or marriage merely. And the legal presumption is, that such a conveyance is valid, and not a fraud upon the rights of any one.

The mere fact that a purchaser, from the holder of such a conveyance, has notice that it was not founded upon a pecuniary consideration, is not sufficient to make it his duty, at his peril, to inquire whether the title of his grantor was not fraudulent. He has a right to act upon the legal presumption that such a deed of gift, or voluntary settlement, was honestly made; unless some other fact is brought to his knowledge, to raise a suspicion in his mind that the conveyance was intended to defraud some one.

Where a deed, executed previous to the revised statutes, conveyed certain premises to a trustee, upon a mere naked trust; in the first place, for the use and benefit of M. C., a married woman, and her heirs and assigns forever; and *secondly*, to convey the premises to such person or persons as she should, by will, or by her certificate in writing, during her life, and after the death of her husband, designate; and if no such last will and testament should be made, or certificate given, then to convey the premises to her heirs after her death; *Held* that the trustee was a mere naked trustee of the legal estate, with a bare power in trust to convey the premises to her devisee, grantee or heirs; either during her life or afterwards. And that the equitable interest of the cestui que trust was turned into a legal estate in the premises, in fee, by the operation of the 47th section of the article of the revised statutes relative to uses and trusts; especially after the death of her husband.

*Held also*, that the whole beneficial interest in the trust property belonged absolutely to the cestui que trust, with the single exception that she could not alienate the same during the joint lives of herself and her husband, without his consent; nor without the concurrence of the trustee.

*Held further*, that, upon the death of her husband, the cestui que trust became absolutely entitled to the land, for all purposes; and that the estate to which she was then entitled in equity, under the provisions of the trust deed, was an absolute right to the possession of the property, and to the receipt of the rents and profits thereof, and the power to dispose of the same to any person, by deed or will. And that in case of her death without will, and without alienating it in her lifetime, it would descend to her heirs at law, in the same manner as if the legal title had been conveyed to her at the time she acquired her equitable interest in the property, by the deed of trust.

Whether the cestui que trust would not have had the right to devise the premises, during the life of her husband, so as to vest the legal title in the devisee, without any conveyance from the trustee, under the provisions of the revised statutes relative to powers, in connection with the operation of the 47th section of the article relative to uses and trusts? *Quære.*

A bona fide purchaser of property, from a previous grantee, to whom it had been

Frazer *v.* Western.

conveyed for the purpose of defrauding creditors, is entitled to protection against the claims of the creditors who were intended to be defrauded by the first conveyance.

THIS was an appeal by the defendant, H. M. Western, from a decree of the late assistant vice chancellor of the first circuit, setting aside a conveyance from I. G. Collins, deceased, to E. K. Collins, in trust, for Mary Collins, of certain lands upon Staten Island, which were subsequently sold and conveyed by her to the defendant Western. The ground upon which the complainants sought to set aside the trust deed was, that it was fraudulent and void as against them, as creditors of I. G. Collins.

The following opinion was delivered by the assistant vice chancellor :

HOFFMAN, A. V. C. The bill was filed for the purpose of setting aside an alleged voluntary and fraudulent settlement of property, made by Israel G. Collins, deceased ; the title to which is now vested in the defendant Western.

In the year 1817, John Mathews, of South Carolina, made his will, by which he gave, among other bequests, to his executors, in trust, for his daughter Mary, then the wife of Israel G. Collins, the one half part of certain slaves, to her use, during her life, free from the control of her husband ; and upon her decease, to her children equally ; with a power of disposition, if there were no children. Upon an application to the court of chancery of South Carolina, a sale of the slaves was ordered, under the direction of a master, and it was further ordered that Israel G. Collins and John Frazer should be substituted as trustees of the portions coming to their respective wives, on their giving to the master ample security, in double the amount of the property to be received by them, to secure the same to the uses and trusts prescribed by Mathews' will. The proportion of Mary Collins, of the proceeds, amounted to $7596,25 ; and this sum was paid over to Collins, by the court, on his giving a bond, with Frazer as security, in double the amount, dated 26th of February, 1818. The bond was given to the complainant, William H. Gibbs, under whose direction, as master, the sale was made. The

condition recited the proceedings, and was, that the obligors should be answerable for the amount, subject to the trusts of the said will. On the 7th of August, 1828, Israel G. Collins conveyed to Edward K. Collins, certain property in the city of New-York, by one deed, and a farm on Staten Island, the subject of the present suit, by another deed. Both conveyances were upon trusts for his wife, which it may be necessary afterwards to notice.

In the year 1831, Israel G. Collins died. On the 8th day of April, 1833, Mary Collins, the widow of Israel G., sold the property to the defendant Western, giving him a certificate which under the trust deed was prescribed, and which he insists entitles him to a conveyance from the trustee. The bill was filed on the 30th of April, 1833. Mary Collins died in 1835, and her whole interest in the original bond vests in her children, who are made defendants. If the deed to Western is sustained, the right to the property is vested in him. The complainant Freeman, is a master of South Carolina, who has succeeded to the office of Gibbs. Frazer is the surety in the bond.

It is necessary to put the case upon the ground of a surety applying to this court to compel the principal, or his estate, to indemnify him. No question can exist as to such right, when the debt is due, and the principal is insolvent. This is the plain doctrine of the civil law; and some cases in the court of chancery have gone further. (*Digest*, 17, 1, 22. 1 *Domat, Book* 3, *tit. n.* § 3. 4 *Inst.* 3, 21. 6 *Code Napoleon*, 3, 14, 2, *art.* 2032. *Huber, lib.* 3. *Just.* 21, 11. *Earl of Ranelaugh* v. *Hayes,* 1 *Vern.* 190. *Lee* v. *Rook, Moseley,* 318. *Campbell* v. *Macomb,* 4 *John. Ch. R.* 538. *Cock* v. *Ravie,* 6 *Ves.* 284.) But, in truth, payment of the bond might be called for at any time, even during Collins' life, and when no default had been made in paying the interest, I think this could have been done. Certainly upon his insolvency, or after his death. The public officer of the court was the obligee, and a trustee, and had a right to sue when he chose; and was bound to sue upon a reasonable apprehension of risk. The bill is, in effect, one by a

Frazer *v.* Western.

trustee on behalf of the children, to obtain payment out of the property of the principal debtor, and the surety need not have been a party; though the uniting him is not, at least upon the hearing, a matter of objection.

Again; it is objected by the counsel of the defendant Western, that such a bill cannot be filed, without a judgment at law being first obtained, and an execution issued fruitlessly. This rule of the court, however, never prevails after the decease of a debtor. If there was no judgment in his lifetime, no suit at law is necessary. The creditors come into this court for satisfaction of the demand, and may assail a fraudulent conveyance, so as to render the property assets for the payment of their debts, without any proceedings at law. This was done in *Lush* v. *Wilkinson*, (5 *Ves.* 384,) the bill being against the executor, and the widow of the grantee. So in *Kidney* v. *Coussmaker*, (12 *Ves.* 152,) in *Holloway* v. *Millard*, (1 *Mad. Rep.* 414,) the bill was against executors of a testator and trustees in a settlement, charging that the personal assets were insufficient, and a fraud on the deed. In *Richardson* v. *Smallwood*, (*Jac. Rep.* 552,) the suit was instituted by the plaintiff, on behalf of himself and the other creditors of Froom, deceased, for the purpose of setting aside a voluntary settlement made by him. The plaintiff became a creditor in fact, after Froom's death, under a covenant in a lease, granted by the latter. He sued the personal representative of Froom, for a breach of covenant, and recovered damages; soon afterwards he filed the bill. The subject of the settlement was leasehold property. It was held that the principal debts had not been proven, but there was ground for inquiry as to their existence; and if proven, that the settlement would be void, and all creditors must be let in. In the case of *Smith* v. *Comstock*, Sept. 1841, I held that a judgment creditor, who was such at the death of the assignor of a fraudulent conveyance of personal property, might file a bill on his own account solely, and obtain a preference over all others; in the same manner as if the debtor was living. This decision was chiefly grounded on the *Bank of the United States* v. *Burke*, (4 *Blackf.* 141,) and the decision in *Osborn* v. *Moss*, (7 *John. Rep.* 181,)

and *Anderson* v. *Roberts*, (18 *Idem*, 526.)    The case in Indiana went further.    The judgment was recovered against the administrator of the fraudulent grantor, and the property was real estate.

Now, at no time would a judgment against executors have been of any avail as to real estate, although a judgment for assets *quando acciderint*, would give a preference when those came to hand; under the revised statutes that privilege is destroyed.  (2 *R. S.* 87, § 28.)  What possible utility, then, can there be in suing the executors at law, when the judgment will not give priority either as to real or personal estate?  It may well be that the personal estate should be shewn to be insufficient; because even a volunteer may have a right to have the admitted assets of the estate first applied.  But this is matter of fact merely, and can as well be charged and proven under an allegation of insolvency, or insufficiency, as established by an execution returned unsatisfied.  The same remark applies to the objection that the parties devisees should be proceeded against at law, to ascertain that there is no other property liable.  Without saying that this would be essential, even where the party died seized of, or devised other property, the matter is one of allegation, as a fact; and a charge of general insolvency would be sufficient, and would save a bill from a demurrer.

It is therefore clear, in my opinion, that a bill may be filed by a creditor, after the death of a debtor who has made a fraudulent assignment, without a judgment against the personal representative or heirs, at least upon a charge of insolvency at his death.  But the question is, whether such a bill must not be on behalf of all the creditors, or whether it may be for the sole advantage of the creditor filing it?  The case is very different where, as in *Smith* v. *Comstock*, the judgment was recovered in the assignee's lifetime, and an execution returned unsatisfied.  It is perfectly consistent with the privilege of the debtor, that such a creditor should get a preference.  His lien had attached upon the property withheld from him, although he was compelled to resort here for relief.  Upon a careful consideration of the authorities, I am of opinion that the case in Indiana will not, since the

revised statutes, apply in this state to a judgment creditor, who obtained his judgment after the party's death. Of course it will not apply where no judgment has been obtained. For in such a case the suit must be on behalf of all the creditors, and will avail for all who could impeach the conveyance. It is said by Lord Hardwick, in *Walker* v. *Barrows*, (1 *Atk.* 94,) that where a man has died indebted, who, in his lifetime, made a voluntary settlement, upon application to this court to make it subject to his debts, as real assets—the court has always denied it unless it was shown he was indebted at the time. In *Russell* v. *Hammond*, (1 *Atk.* 13,) the bill was by creditors of William and G. Hammond, deceased, to be relieved from various settlements made after the marriage of William Hammond, and alleged to be fraudulent as against those creditors; seeking that such fraudulently settled property might be sold, and the proceeds applied in aid of the other estates, towards payment of the debts. The master of the rolls decreed a general account of the personal estate of William Hammond, to be applied in payment of the plaintiffs. And all other the bond creditors of William Hammond in a course of administration—the same as to the personal estate of G. Hammond, (of course the personal representatives were parties.) The decree declared, that if the personal estates were not sufficient to pay the plaintiffs, and other bond creditors, then that the settlement made of the leasehold estates was fraudulent, with respect to the creditors, and ought to be set aside; and that such part of the leasehold as was the proper estate of G. Hammond at the time of making such settlement, should be applied in satisfaction of such of his bond creditors as his personal estate should fall short of satisfying. The same directions were given as to so much of the leasehold as was William Hammond's proper estate at the time of the settlement. An account of the rents of the leasehold property received by Elizabeth Hammond was directed, and if insufficient to pay the creditors, then a competent part of the leasehold property was to be sold, and the money applied to pay them. Upon an appeal to Lord Hardwick he said, that what was sought by the creditors was an application of the leasehold

estaté as assets for the payment of their debts. He reversed the decree as to one of the leasehold estates, and affirmed it as to the other. The principle of the decree was therefore sustained.

I look upon this authority as very instructive upon this subject. First, it shows, that the other personal estate of a fraudulent settler ought first to be resorted to; next, that a judgment against the testator, or intestate, or the representative, is needless; and lastly, I think it tends to show that the subject matter of the fraudulent settlement, or assignment, becomes equitable assets, and as equitable assets is distributable equally or proportionally. The use of the phrase in a course of administration, when applied to the regular personal estate, and its omission when the direction is given as to the settled estate, is a circumstance of much weight. This point, however, is by no means certain, and it may be that the court in England still regards the priority of the law in distributing legal assets, as applicable to such a case. In our state this priority is now permitted in a few instances only, and all means of giving it among debts of equal degree are abolished.

The cases in South Carolina of *Brockman* v. *Bowman*, (1 *Hill's Ch. R.* 338,) and *Brown* v. *McDonald*, (*Id.* 297,) establish the position that no preference can be obtained by one creditor over others, by filing a bill to impeach a fraudulent conveyance. But I think the former case goes too far in holding that the property delivered to the executor should be applied. In *Ainslie* v. *Radcliff*, (7 *Paige*, 444,) the chancellor adverts to the right of one judgment creditor of the decedent, to obtain a preference over others of the same class, by taking proceedings subsequent to his death; such as suing out execution. I look upon this as strengthening the view taken, that the filing a bill here, upon a judgment, before a party's death, will give a preference.

In *Whittington* v. *Jennings*, (6 *Sim. Rep.* 493,) S. Tice had a life interest in certain nine shares vested in trustees, with a power of appointing the same to the extent of £760, in such persons as, by deed, or will, he should name. In 1834 he became indebted to the plaintiff in £68, and gave him a warrant of attorney to secure that sum. In 1816, he owed the plaintiff

Frazer v. Western.

£107. And in that year he made a voluntary appointment of the £760 in favor of the defendants; but of this, the plaintiffs had no knowledge, until after Tice's death. Payments were made exceeding the sum due at the date of the appointment, but still the actual balance of debt was increased until it amounted, at Tice's death, to £536. He appointed the plaintiff his executor. The defendants claimed to have the £760 paid to them, and the plaintiff filed his bill to have the appointment declared fraudulent, as against himself and the other creditors, if any. The vice chancellor declared that Tice was insolvent in 1811, and not solvent subsequently, and that the plaintiff was entitled to the £760, as part of the testator's assets. In this particular I apprehend the vice chancellor was wrong. The property might be considered as assets for the payment of debts; and the plaintiff was apparently entitled to his £536, but the surplus could not be taken from the volunteer as assets, unless there were other creditors to be ascertained by an inquiry.

The case of *Shears* v. *Rogers*, (3 *Barn. & Adol.* 362,) also deserves notice. The action was debt on bond. A plea of plene administravit præter £106 3 11. The question was, whether a certain lease, agreed to be of the value of £200, was assets in the defendant's hands. After the debt accrued, and the debtor had been threatened with legal measures to recover it, he made a voluntary assignment of the lease in question to the defendant for the use of his daughter-in-law. He continued in possession of the premises till his death, and by his will appointed the defendant his executor. The defendant delivered the deed of assignment to the husband of one of the daughters-in-law. Lord Tenterden said, (and the remark is very pertinent to the present case, on the question of insolvency,) "a man owing £500, and having property to that amount, may render himself insolvent by assigning it over to a third person. There is, undoubtedly, high authority for saying that a party must be in insolvent circumstances to render a conveyance to him fraudulent within the statute; but that must not be understood as importing that a person may not render himself insolvent by conveying his property to a person who is not a creditor. The

authorities show, that wherever a man makes a gift of goods, which gift is fraudulent and void as against creditors, and dies, he is considered to have died in full possession with respect to the claims of the creditors, and the goods are assets in the hands of his executor."

There are some expressions of the other judges in this case, tending to show that the fraudulent lease was assets at large; and *Bethell* v. *Stanhope*, (*Cro. Eliz.* 810,) is cited by Justice Taunton as law. Certainly it is not law in our state. It is clearly overruled by *Osborne* v. *Moss*, (7 *John. Rep.* 161.) I take the expression of Lord Tenterden to show the true state of the law—the goods are assets in the hands of any one who holds them, for payment of the creditors, and in respect of them, but for no one else. Justice Littledale says, "the assignment was void as soon as the creditors claimed to treat it as such, though not until then."

It may be added that if a single creditor files a bill, he gets a decree merely for the payment of his demand in a course of administration. (*Att'y Gen.* v. *Cornthwaite,* 2 *Cox,* 45.) Mr. Bell testified before the English commissioner of 1816, that bills by a creditor of a deceased party not on behalf of himself and all the other creditors are almost disused.

And upon the doctrine of a distribution of assets equally, the late cases of *Mitchelson* v. *Piper,* (8 *Sim.* 65,) and *Wilson* v. *Paul,* (*Id.* 63,) are very strong. It was there held, that where an executor had paid a part of a debt, the creditor could not receive any more out of legal or equitable assets until the other creditors were paid proportionably.

The results which I have arrived at in the present case, and in that of *Smith* v. *Comstock,* are these: That where a creditor has obtained a judgment in the lifetime of a fraudulent assignor, and issued his execution, fruitlessly, he may file a bill after the death of the assignor to set aside the assignment, and will have a preference, whether the assigned property is real or personal, in the same manner as if the debtor had been living. That if the assignor dies before a judgment is recovered, no right of preference can be obtained; and a bill filed for the purpose of

Frazer v. Western.

setting aside the conveyance must be on behalf of the complainant and all others, the creditors of the assignor. This is on the ground that the property fraudulently conveyed remains the property of the grantor as to creditors, though not as to any other persons : and when this court is applied to it will treat such property, according to its favorite doctrine, as equitable assets. The law having now provided that there shall be no legal preference among debtors, except in the case of the United States and for taxes and judgments against the deceased, there is nothing to prevent the application of this doctrine with these exceptions. But the property can be decreed assets only as to creditors. If, by means of the statute of limitations, releases or otherwise, these can be excluded, the voluntary gift will stand, and it will stand as to any surplus after paying admitted creditors.

There can be no question that the conveyance to Mrs. Collins was fraudulent and void. Collins was indebted to his partners, and had been for several years. A judgment had been entered against him for rent in the year 1826, which was never satisfied ; and there was the very heavy debt in question of $7590, for money received by him and spent. He appears to have had no property whatsoever, but the two parcels of land conveyed by him. The evidence respecting his claims under the French treaty is too vague for any reliance. The value of the property, as tested by the sales, was about $3600 ; and the remark of Lord Tenterden before noticed is here very appropriate. After the dissolution of the firm, as I understand, he had been in the lunatic asylum, supported by his son ; and it cannot be questioned that he died insolvent, and was so in August, 1828, the date of the deeds.

It may be considered as not entirely settled in England, whether any extent of debt short of insolvency will be sufficient to render a voluntary settlement fraudulent. (See *Townsend* v. *Westacott*, 2 *Beavan*, 340 ; *Norcutt* v. *Dodd*, 1 *Craig & Phill.* 100 ; *Shears* v. *Rogers*, 3 *Barn. & Adol.* 362 ; *Bonny* v. *Griffith, Hayes' Exch. R.* 120.) It is not disputed that in this court the judge is the substitute for the jury at common law : and the question is what satisfies him of a fraudulent intention. But he

also is expressly prohibited by the statute, (2 *R. S.* 137, § 4,) from saying that the deed is fraudulent, simply because it is voluntary. He is however at liberty to treat a heavy amount of debts as a strong evidence of such intent, and utter insolvency as a proof of insuperable force. Thus I understand the statute, and this view is sanctioned by the explanations of the revisers. They adopted the section as the basis of the doctrine of *Van Wyck* v. *Seward*, as to creditors, and in order to do away with the severity of *Meade* v. *Livingston*. They had also in view the abolition of the then existing rule as to subsequent purchasers. While, therefore, I am obliged to pronounce, as a matter of fact, that there was a fraudulent intent in the matter of this conveyance, I am at liberty to give all the weight to other facts which the courts have undeviatingly attributed to them ever since the statute of Elizabeth; and certainly no judge can be found who has not admitted that utter insolvency was enough to establish the fraudulent intention against existing creditors of a voluntary grantor. Whether a court of law can set aside a verdict, or repeatedly set it aside, where the jury find a conveyance free from fraud in a case of palpable fraud in law before the act, is a question it becomes me not to enter upon.

But the more difficult question relates to the rights of the defendant Western. Mr. Western shelters himself under the plea of there being no fraud in the transaction; that a valuable consideration was in fact received by Collins; and next, if that ground fails, that he is a purchaser for valuable consideration without notice.

The first branch of this defence is plainly unsupported. His answer distinctly admits that all the interest on the bond had been duly paid to Mrs. Collins down to the filing of the bill. No debt therefore existed from the husband to the wife, arising out of the account. Then it is said that the husband had received some property given to his wife by her brother's will. There is no proof of this, and the averment is plainly irresponsive.

It does not appear necessary to dwell upon the nature of Mrs. Collins' estate and right, under the conveyance from her hus-

Frazer *v.* Western.

band, or the operation of the revised statutes upon that estate. It is sufficient to say that the equitable estate was first given to her in fee : and then an absolute power of appointment of the fee by means of a certificate, under which her trustee was bound to convey. If no appointment was made, then it was to go to her heirs. Under the appointing power, therefore, she could direct a conveyance without her husband's joining.

The defendant Western states that, in 1833, he obtained a judgment against Mary Collins for $326,37, and had also a claim against her amounting to about $300 ; that Mary applied to him to purchase the property in question—then producing the trust deed to him as evidence of her ownership—that he had no knowledge or notice of any matters other than those expressed in such trust deed, and he entered into a negotiation with Mary for the purchase ; that a partial bargain was made, and afterwards reduced to writing, and duly recorded before the filing of the bill, and in pursuance thereof the defendant, on the 8th of April, 1833, paid to her $1400 in cash, and executed a satisfaction piece of the judgment, and a discharge of the other debt, and took from her a full and absolute conveyance of the premises. He states that Edward H. Collins and John Anthon knew of the contract in time to have given him notice ; but of this there was no proof. He adds that he has tendered the certificate to the trustee and required a release, but that the trustee has refused to execute the same.

The defendant had been the counsel of Mrs. Collins, and had so far dealt with her as to have become entitled to his judgment and the debt of $300. His answer in strictness denies notice only at the time of the negotiation, not when the money was paid ; but as he denies the fraud entirely, and also the insolvency, I may, perhaps, consider this difficulty removed, and that the assertion is, he knew nothing of the facts constituting the fraud, when the transaction was consummated. He had, however, the trust deed in his possession, and of course is charged with knowledge of every thing in it.

That deed showed that the consideration was nominal, and the conveyance a voluntary one by a husband to his wife.

It showed that there was a trustee, and that upon her certificate he was to convey. The question is whether the defendant, being clearly chargeable with notice of the deed being voluntary, is not chargeable with the duty of inquiring whether it was made in a state of insolvency, and into all the facts connected with it.

In *Sigourney* v. *Munn,* (7 *Conn. Rep.* 333,) the law is well expressed by Chief Justice Hosmer. "Whatever is sufficient to put a person on inquiry is considered in equity as conveying notice; as the law imputes to a person the knowledge of a fact of which the exercise of common prudence and ordinary diligence must have apprised him. Holbrook, who must be presumed to have read this writing, could not fail to observe its peculiarities, to have his attention awakened by them, and to see the path which would conduct him to a full knowledge of the plaintiff's rights."

In *Kennedy* v. *Green,* ( 3 *Myl. & Keen,* 699,) some suspicious circumstances appeared upon the face of a deed under which the defendant claimed. The master of the rolls said, "the perusal of the deeds would have led every man of business to the conclusion that there was something irregular, and the nature of the transaction would therefore have induced an inquiry which, if pursued with reasonable diligence, would have led, by reference to the plaintiff, to a full knowledge of all the circumstances."

Upon a rehearing before Lord Brougham, he said: "The principle is quite undeniable, and that whatever is notice enough to excite attention and call for inquiry, is also a notice of every thing to which it is afterwards found such inquiry would have led, although all was unknown for want of the investigation."

See further, *Taylor* v. *Baker,* (*Dan. R.* 79 ;) *Booth* v. *Barnum,* (9 *Conn. R.* 289 ;) *Hawley* v. *Cramer,* (4 *Cowen,* 717 ;) *Green* v. *Slayter,* (4 *John. Ch.* 47 ;) *Pendleton* v. *Fay,* (2 *Paige,* 204.) Now in the present case, how slight an inquiry must have led to the knowledge of Collins' insolvency ? An inquiry of Edward K. Collins to whom the deed of settlement led him, would have shown that his father had been in the asylum; had

been supported by him, and was utterly insolvent at the dissolution of the firm, in May, 1830 ; and he would have been led to the inquiry whether he was also insolvent at the date of the deed, in August, 1828.

Again, the defendant's witness, Boardman, says that in a conversation between Mrs. Collins and the defendant, she said he had fairly bought the land at her repeated request, when no other person would take the title she could give. I may say in the language of Sir William Grant, (7 *Ves.* 170,) "It was not necessary to use any exertion to obtain information, but merely not to shut his eyes against the information which, without extraordinary neglect, he could not avoid receiving."

There are two cases, however, deserving notice upon this head, (*Kenny* v. *Brown*, (3 *Ridg. P. C.* 462,) and *Coleman* v. *Cocke*, (6 *Ham.* 618.) In the former an attorney was employed to sue for his client, and having filed a bill obtained a decree for certain lands and deeds, and for an account of rents; he then obtained from his client, by fraudulent statements and imposition upon a very ignorant man, a lease of the property forever, at a rent of £36. The lease recited the consideration to be the many services done, and obligations conferred, upon the lessor by the lessee. Upon the lessee's marriage, he settled the property to the use of his intended wife after his death, and then in tail male. Afterwards a bill was filed to set aside the grant, on the ground of fraud. This was abundantly made out, and the decree set the settlement aside as to the attorney's life estate. The chancellor, Lord Fitzgibbon, added, "I entertain some doubts whether the nature of the original transaction was not such as necessarily led to notice of the frauds committed by him, more particularly as the grant, and the consideration of it, are recited in the settlement. However, I think that it would be going too far to determine that the recital of a fact in a deed, which might, or might not, according to circumstances, be held in a court of equity, to amount to a fraud, would of necessity affect a purchaser for a valuable consideration denying actual notice of fraud. Wherefore I did not feel at liberty to go beyond the party's life estate."

From the course of reasoning, in this case, it is plain the

Frazer *v.* Western.

court held, that the grant was not *per se* fraudulent, as being made to an attorney, but was so from the extraneous circumstances of the fraudulent practices ; nor did it appear on the grant that the connexion had not ceased. Still the authority is of much weight in favor of the defendant.

In *Coleman* v. *Cocke,* a father had made purchases of property, and paid or secured the purchase money himself, and directed the conveyances to be made to his son, who never paid any thing. These conveyances were set aside by creditors of the father; but a conveyance to a third person was upheld under the following circumstances : The father had procured the deed to be made to his son William A. Bentley. I presume the valuable consideration actually paid, was stated in the deed. In 1807, William A. Bentley conveyed a parcel of the property, amounting to 600 acres, to his brother Peter E. Bentley, in consideration of one dollar. Then in 1813, Peter E. Bentley conveyed to Coleman part of the tract of 600 acres, for a valuable consideration. Notice of the fraud in Coleman, was charged, but fully denied in the answer, and unsupported by evidence. This deed was sustained on appeal.

This cause is clearly distinguishable from the present. The son, William A. Bentley, appeared on the deeds, the lawful owner. He conveyed to Peter by a voluntary deed, it is true, but that might have raised a question with Peter's creditors, but could not lead to any supposition that the father's creditors were defrauded. Therefore there was nothing in the force of the instruments creating a suspicion stimulating inquiry.

It strikes me that the protection of creditors against fraudulent voluntary deed, imperatively requires the adoption of the rule that the purchaser from a voluntary grantee, the wife or child of the grantor, is bound, by the knowledge of the deed being voluntary, to inquire into the situation of the grantor at the time of its execution ; and if the grantor was then openly insolvent, and an inquiry with ordinary prudence would have disclosed the fact, he cannot shelter himself under his purchase. Mrs. Collins was made a party to the bill, to reach the avails of the other parcels of property sold by her ; and to apply

it to her interest in the bond.   She has died, and the complainants are content not to seek any relief against her estate, if there is any.   I do not see any necessity for bringing her personal representatives or devisees into this court.

I do not consider that the personal representative of Israel G. Collins was a necessary party; but the bill was not demurrable for making him so.   I think that in these cases the personal representative or heir of a fraudulent grantor need not be a party, where there is a charge of insolvency.   If the grantee, or a purchaser under him, sets up a sufficiency of estate, besides the subject of the grant, it may, perhaps, be necessary to bring them in.   I do not mean to say that even in such a case, this is essential.

The result is, that the bill must be amended, by making it on behalf of the complainant, and all the creditors who may come in and contribute.   A reference must be directed, to call in the creditors of Israel G. Collins, to prove their claims; the master to state the nature and priority of the debts, proved before him, according to the provisions of part two, title three, chapter six, article two, of the revised statutes.

The decree must declare that the conveyance by Mary Collins to the defendant Henry M. Western is void, as to the complainants and all other the creditors of Israel G. Collins, whose debts shall be proved before and allowed by the master.

The costs of the infants, and of the public administrator, to be allowed to the date of the decree; no future costs to be allowed them, as their interference in the suit will be unnecessary.   The question as to the costs of the other parties is to be reserved until the coming in of the report.

*H. M. Western,* for the appellant.

*J. Anthon,* for the complainants.

*J. Blunt,* for the infant defendants.

THE CHANCELLOR.   Several questions were raised and disposed of by the assistant vice chancellor, which it is not neces-

sary now to consider, in consequence of the conclusion at which I have arrived, that the defendant Western is entitled to protection as a bona fide purchaser without notice of the fraud, if any there was, in the conveyance of August, 1828, to E. K. Collins in trust. Nor is it now necessary to consider the question, whether the assistant vice chancellor was authorized, at the hearing of the cause, to allow the complainants to amend their bill, in a part which he deemed essential, and at once to proceed to a decree; without giving to the appellant an opportunity to answer the new case made by such amendments.

The bill, among other things, charges that the title of Western to the premises is fictitious, and was created without any valuable consideration; with a view to defeat the rights of the complainants. And it calls upon him to set forth the nature and origin of his title, what he paid for the same, and whether the same was not made to defeat the complainants' rights in the premises. His answer is, therefore, directly responsive to the bill, and as it is not disproved, but on the contrary is sustained by one witness in its material parts, it is evidence in his favor of the facts contained therein, in respect to his title and the consideration thereof. He denies that the conveyance to him from Mrs. Collins, was without consideration, or that it was made in trust for her, or that she was to receive any benefit therefrom, by any agreement, express or implied, between her and him; but on the contrary, he insists that the conveyance to him was for his own use and benefit. He also states particularly what the consideration was, and how it was paid; that he had a judgment against her, which was a lien upon her interest in the property, to the amount of $326; and another debt against her of $300, for which he held a lien upon valuable papers in his hands; that she applied to him to purchase the premises in the fore part of April, 1833, after the death of her husband, alleging that she was the owner thereof; that she produced to him the original trust deed, as the evidence of her right to sell the premises; and that he had no notice of the matters charged in the complainants' bill, except so much thereof as appeared upon the face of the trust deed. He further states that he thereupon

contracted with her for the purchase of the premises, and paid her therefor $1400 in cash, and paid the residue of the consideration by discharging his judgment against her, and the debt of $300, at the same time giving up the papers upon which he had a lien for such indebtedness; and that she then gave to him a full and absolute certificate entitling him to the property according to the terms of the trust deed, and also a full and absolute conveyance from her of the premises, under which he insists that he is the legal as well as the equitable owner of the property. He also denies that the grantor, in the deed of trust, was insolvent, or that such deed was voluntary and without consideration, according to the best of his information and belief. The answer therefore contains a substantial denial of all knowledge of the complainants' equitable rights, or that the first deed was fraudulent and void, as against the creditors of the grantor, at the time the defendant paid the purchase money and obtained his title to the premises.

The assistant vice chancellor appears to have based his decree upon the erroneous supposition, that the fact that the consideration mentioned in the deed of trust was merely nominal, was constructive notice of the fact that the grantor was insolvent; and that the conveyance was made for the purpose of defrauding the creditors of such grantor. In other words, that there cannot be a bona fide purchaser from a person who is entitled to property by deed of gift, or by a voluntary settlement, in case it afterwards turns out that the grantor was indebted to such an extent that the conveyance, or voluntary settlement, would operate as a fraud upon his creditors. This, however, is not a correct exposition of the law upon this subject. The law sanctions a conveyance founded upon the consideration of blood or of marriage merely. The legal presumption therefore is, that such a conveyance is valid, and not a fraud upon the rights of any one. And the mere fact that the purchaser, from the holder of such a title, has notice that it was not founded upon a pecuniary consideration, is not sufficient to make it his duty, at his peril, to inquire whether the title of his grantor was not fraudulent. On the contrary, he has a right to act upon the legal presumption

that such a deed of gift, or voluntary settlement, .vas honestly made; until some other fact is brought to his knowledge to raise a suspicion in his mind that the conveyance was intended to defraud some one. In the present case, there is some evidence which renders it at least probable that I. G. Collins was not able to pay all his debts, in August, 1828, when the trust deed was executed ; especially if he had no property except his interest in the firm in which his son was a copartner, and had no capital in that firm. But there is not a particle of evidence in this case that Western, who purchased of Mrs. Collins five years after that time, was acquainted with her husband, in his lifetime, or with his circumstances in 1828 ; so as to make it his duty to inquire whether I. G. Collins, or his son who was the grantee in the deed of trust, had not intended to commit a fraud upon the creditors of the former, by the execution of this deed in favor of the wife.

The only remaining inquiry therefore, is, whether the appellant acquired the legal title to the premises in question, so as to entitle him to protection as a bona fide purchaser without notice. The legal title, in 1828, and under the law then in force, was vested in E. K. Collins, the trustee; and the cestui que trust, or her grantee, previous to 1830, would only have had an equitable interest in the property. But upon a careful examination of the provisions of the rĕvised statutes, I think the appellant acquired the legal title to the premises, under the conveyance from Mrs. Collins in April, 1833. The deed of 1828 conveys the premises to the trustee upon a mere naked trust ; in the first place, for the use and benefit of .Mary Collins and her heirs and assigns forever. It then contains the further trust that the trustee shall convey the premises to such person or persons as she shall by will, or by her certificate in writing, during her life, and after the death of her husband, designate ; and if no such last will and testament shall be made, or certificate given; then to convey the premises to her heirs, after her death. The trustee, then, even before the revised statutes, held the premises as a mere naked trustee of the legal estate ; and with a bare power to convey to her devisee, grantee, or heirs, either during her life or afterwards. I think, therefore,

that the equitable interest of Mrs. Collins was turned into a legal estate in fee, in the premises, by the operation of the forty-seventh section of the article of the revised statutes relative to uses and trusts; (1 *R. S.* 727;) especially after the death of the husband. That section provided that every person who by virtue of any grant, assignment or devise, then was, or thereafter should be, entitled to the actual possession of lands, and to the receipt of the rents and profits thereof, in law or in equity, should be deemed to have a legal estate therein; of the same quality and duration, and subject to the same conditions, as his beneficial interest. The next section, however, declared that the preceding section should not divest the estate of any trustees in any trust then existing, where the title of such trustees was not merely nominal, but was connected with some power of actual disposition or management, in relation to the lands which were the subject of the trust. The object of this last section undoubtedly was to preserve the legal title in the trustees, in trusts which had already been created, wherever and so long as the continuance of such legal title in them was necessary to carry into effect any of the objects of the trust; and where such objects could not be carried into effect if the whole legal title was immediately vested in the cestui que trust. Although the whole beneficial interest in the trust property in this case, therefore, belonged absolutely to Mrs. Collins, with the single exception that she could not alienate the same during the joint lives of herself and her husband, without his consent, as well as by the concurrence of the trustee, there does not appear to have been any active trust, or power of disposition, which was necessary to be performed by the trustee, after the revised statutes went into operation; except the power in trust to convey the legal title to the devisee of Mrs. Collins, in case she died before her husband. And it is even doubtful whether the cestui que trust would not have had the right to devise the premises during the life of her husband, so as to vest the legal title in her devisee without any conveyance from the trustee; under the provisions of the revised statutes relative to powers, in connection with the operation of the forty-seventh section of the article relative to uses

and trusts. That last mentioned section provides that the cestui que trust shall have a legal estate in the land, of the same quality and duration, and subject to the same conditions, as his beneficial interest therein. Here one quality of the beneficial interest of the cestui que trust was that she had the power to dispose of the property, by devise, notwithstanding her coverture. Such a power, by the express terms of the article of the revised statutes relative to powers, may be given to a married woman; to enable her to dispose of her freehold estate by deed or will without the concurrence of her husband. (1 *R. S.* 732, § 80. *Idem,* 735, § 110.) But even if the continuance of the legal estate in the trustee, in this case, was necessary for any purpose during the life of the husband of the cestui que trust, she became absolutely entitled to the land, for all purposes, upon the death of her husband. And the estate to which she was then entitled in equity, under the provisions of the trust deed, was an absolute right to the possession of the property, and to the receipt of the rents and profits thereof; with a right to dispose of the same to any person, by deed or will. And in case she had died without will, and without aliening it in her lifetime, it would have descended to her heirs at law; in the same manner as if the legal title had been conveyed to her at the time she acquired her equitable interest in the property by the deed of trust. She had therefore the whole legal title, when the appellant made his purchase. And he obtained such title by her deed to him in April, 1833, and before the commencement of this suit; which suit appears to have been the first information that Western had of the claim that the trust deed of August, 1828, was intended to defraud creditors. Since the reversal of Chancellor Kent's decision in the case of *Roberts* v. *Anderson,* by the court of dernier resort, (3 *John. Ch. Rep.* 372, 18 *John. Rep.* 515, *S. C.*) it is no longer an open question, in this state, that a bona fide purchaser of property, from a previous grantee to whom it had been conveyed for the purpose of defrauding creditors, is entitled to protection against the claims of the creditors who were intended to be defrauded by the first conveyance. And the appellant in this case being a bona fide purchaser, and entitled

to such protection, the decree appealed from must be reversed; and the complainants' bill must be dismissed with costs, both upon this appeal and upon the proceedings in the original suit, to be taxed. And as a necessary consequence of this decision, the complainants must pay the costs of the guardian ad litem of the infant defendants, who have been brought before the court as parties to this suit.