## Case No. 12,620.

### SEDGWICK v. PLACE et al.

[5 Ben. 184; 5 N. B. R. 168; 3 Chi. Leg. News,
409; 4 Am. Law T. Rep. U. S. Cts.
179; 6 Am. Law Rev. 181.] [1]

District Court, S. D. New York.   June 7, 1871.[2]

BANKRUPTCY—VOLUNTARY CONVEYANCE BY A SOL-
VENT GRANTOR.

A conveyance by a man to another who subse-
quently conveys to the wife of the first grantor,
cannot be set aside as being fraudulent and void
under the statute of New York (2 Rev. St. p.
137, § 1), if, at the time of such conveyance, the
grantor was solvent and had no intention of de-
frauding his creditors, where the application to
set it aside is made in behalf of subsequent cred-
itors.

[Cited in U. S. v. Stiner. Case No. 16,404;
Platt v. Mead, 9 Fed. 98.]

This was a suit brought by [John Sedgwick],
an assignee in bankruptcy [of James K. Place
and James D. Sparkman, against James K.
Place and others], to set aside, as void, various
conveyances made by the bankrupts. Among
the property so sought to be recovered was a
house in the Fifth avenue, in the city of New
York, with the furniture, held by the wife of
one of the bankrupts.

[See Case No. 12,622 and note.]

F. N. Bangs, for plaintiff.

E. H. Owen, T. C. T. Buckley, and J. K.
Hayward, for defendants.

BLATCHFORD, District Judge. The rear-
gument of this case as respects the Fifth ave-
nue property, and the furniture therein and the
proceeds thereof, has only served to confirm
the conclusion at which I arrived on the first
argument, that the plaintiff is not entitled to
a decree, as prayed for, as respects such prop-
erty, furniture and proceeds.

The plaintiff claims that the settlement made
by James K. Place, on his wife, of the Fifth
avenue property, should be set aside as fraud-
ulent and void, because made with an intent
to hinder, delay and defraud the creditors of
James K. Place. The settlement was a vol-
untary one, made in consideration only of the
marriage relation. The plaintiff, as assignee
in bankruptcy of James K. Place, is vested,
by virtue of the 14th section of the bankruptcy
act [of 1867 (14 Stat. 522)], with all property
conveyed by the bankrupt in fraud of his cred-
itors.

It was decided by the supreme court of the
United States, in 1823 (Sexton v. Wheaton, 8
Wheat. [21 U. S.] 229), that a voluntary set-
tlement in favor of a wife cannot be impeach-
ed by subsequent creditors merely because it
was voluntary.

In Hinde's Lessee v. Longworth, 11 Wheat.
[24 U. S.] 199, in 1826, the doctrine was laid
down, that the mere fact that a grantor, who
makes a deed to a child in consideration of

1 [Reported by Robert D. Benedict, Esq., and
here reprinted by permission. 6 Am. Law Rev.
181, contains only a partial report.]

2 [Reversed in Case No. 12,621.]

affection, is in debt to a small amount, will not
make such deed fraudulent as against credit-
ors, if it be shown that the grantor was in
prosperous circumstances and unembarrassed,
that the gift to the child was a reasonable pro-
vision according to his state and condition in
life, and that enough was left for the payment
of the debts of the grantor. This doctrine
was approved by the court of appeals of New
York, in 1851, in Carpenter v. Roe, 10 N. Y.
227, and, in 1862, in Babcock v. Eckler, 24 N.
Y. 623. The case last cited also says, that
subsequent indebtedness cannot be invoked to
make that fraudulent which was honest and
free from impeachment at the time.

In Van Wyck v. Seward, 6 Paige, 62, in
1836, Chancellor Walworth said: "I presume
it cannot be seriously urged, that, where a par-
ent makes an advancement to his child, honest-
ly and fairly retaining in his own hands, at
the same time, property sufficient to pay all
his debts, such child will be bound to refund
the advancement, for the benefit of creditors,
if it afterwards happens that the parent, either
by misfortune or fraud, does not actually pay
all his debts which existed at the time of the
advancement."

In Bank of U. S. v. Housman, 6 Paige, 526,
in 1837, the same judge said that it was the
settled law of New York, that a voluntary con-
veyance was not per se fraudulent, even as
against creditors to whom the grantor was in-
debted at the date of the deed.

In Frazer v. Western, 1 Barb. Ch. 220, in
1845, the same judge says: "The law sanc-
tions a conveyance founded upon the consid-
eration of blood or of marriage merely. The
legal presumption, therefore, is, that such a
conveyance is valid, and not a fraud upon the
rights of any one."

In Parish v. Murphree, 13 How. [54 U. S.]
92, in 1851, the result of the cases in regard
to the statute of 13 Elizabeth, rendering void
conveyances made with intent to delay, hinder
or defraud creditors, is well summed up by
the court in these words: "The various con-
structions which have been given to the stat-
utes of frauds by the courts of England and
of this country, would seem to have been in-
fluenced, to some extent, from an attempt to
give a literal application of the words of the
statute instead of its intent. No provision can
be drawn so as to define minutely the circum-
stances under which fraud may be committed.
If an individual, being in debt, shall make a
voluntary conveyance of his entire property, it
would be a clear case of fraud; but this rule
would not apply if such a conveyance be made
by a person free from all embarrassments, and
without reference to future responsibilities.
But, between these extremes numberless cases
arise, under facts and circumstances which
must be minutely examined, to ascertain their
true character. To hold that a settlement of
a small amount, by an individual in independ-
ent circumstances, and which, if known to the
public, would not affect his credit, is fraudu-
lent, would be a perversion of the statute. It

did not intend thus to disturb the ordinary and safe transactions in society, made in good faith, and which at the time subjected the creditors to no hazard. The statute designed to prohibit frauds, by protecting the rights of creditors. If the facts and circumstances show clearly a fraudulent intent, the conveyance is void against all creditors, past or future. Where a voluntary conveyance is made by an individual free from debt, with a purpose of committing a fraud on future creditors, it is void, under the statute. And if a settlement be made without any fraudulent intent, yet if the amount thus conveyed impaired the means of the grantor so as to hinder or delay his creditors, it is, as to them, void."

These were the generally accepted doctrines in regard to voluntary settlements until the decision of Lord Chancellor Westbury, in 1864, in the case of Spirett v. Willows, 3 De Gex, J. & S. 293, 11 Jur. (N. S.) pt. 1, p. 70. In that case it is said: "The plaintiff sues, as a creditor, to set aside a voluntary settlement or deed of gift made by the defendant, his debtor. The plaintiff's debt was contracted before the time of making the settlement. He has since recovered judgment at law, and the debtor has become bankrupt. The plaintiff complains, in the words of the statute of Elizabeth, that his judgment and execution are hindered, delayed and defrauded by the conveyance of the goods and chattels of his debtor, made by this voluntary settlement. The defence is, that, at the time of. making the settlement, the debtor reserved and had property enough to pay the plaintiff and all his other creditors in full, and that the settlement, therefore, is not fraudulent, because the debtor remained solvent after he had made it. There is some inconsistency in the decided cases on the subject of conveyances in fraud of creditors, but I think the following conclusions are well founded: If the debt of the creditor by whom the voluntary settlement is impeached, existed at the date of the settlement, and it is shown that the remedy of the creditor is defeated or delayed by the existence of the settlement, it is immaterial whether the debtor was or was not solvent after making the settlement. But, if a voluntary settlement or deed of gift be impeached by subsequent creditors, whose debts had not been contracted at the date of the settlement, then it is necessary to show either that the settlor made the settlement with express intent to delay, hinder or defraud creditors, or that, after the settlement, the settlor had no sufficient means or reasonable expectation of being able to pay his then existing debts, that is to say, was reduced to a state of insolvency, in which case the law infers that the settlement was made with intent to delay, hinder or defraud creditors, and is, therefore, fraudulent and void. It is obvious, that the fact of a voluntary settlor retaining money enough to pay the debts which he owes at the time of making the settlement, but not actually paying them, cannot give a different charac-

ter to the settlement, or take it out of the statute. It still remains a voluntary alienation, or deed of gift, whereby, in the event, the remedies of creditors are delayed, hindered or defrauded. I am, therefore, of opinion, that this settlement is void, as against the plaintiff." This case of Spirett v. Willows came under consideration in the case of Freeman v. Pope, L. R. 9 Eq. 206, in 1869. In that case, a subsequent creditor of the settlor's brought the suit, to set aside, as fraudulent and void, under the statute of 13 Elizabeth, as against the creditors of the settlor, a settlement of a policy of life insurance made by the settlor upon his goddaughter, in consideration of affection. Vice-Chancellor James says: "Were this case absolutely free from authority, I should have thought that the question I had to put to myself under the statute, was, in the words of the statute, whether there was actually any intention, by this settlement, on the part of the settlor, to defeat, hinder or delay his creditors. If I were a special juryman to whom such a question were put to me by the judge, I should, upon the facts of this case, come to the conclusion, that this gentleman had no such intention whatever. I am satisfied that he had not any idea whatever of defrauding or cheating his creditors by making that settlement, in favor of his goddaughter, of the policy of assurance." He then says that he considers himself bound by the decision of Lord Westbury in Spirett v. Willows, though he cannot follow the reasoning. He then quotes the material parts of the judgment of Lord Westbury, as above cited, and comments upon them thus: "That is to say, it is immaterial whether the debtor had any intention whatever of defeating his creditors; but if, in the result, from some accident, a small debt remained unpaid for some years, and, by reason of a voluntary settlement and subsequent insolvency of the debtor, the creditor was delayed in the payment of his debt, then, however honest the settlement was, however solvent the settlor was at the time, if at the time he had £100,000 and put £100 in the settlement, and a creditor for say £10 happened to be unpaid in consequence of the settlor losing his money in the interval, that would be quite sufficient to set aside the voluntary settlement. That is the decision of Lord Westbury. I am bound by that decision, and, therefore, although bound to express my extrajudicial opinion, that this gentleman, having regard to his income and his means, had no intention whatever to cheat his creditors at that time, I must judicially declare this settlement to be fraudulent and void as against his creditors." This case of Freeman v. Pope was appealed, and was heard on appeal before Lord Chancellor Hatherley and Lord Justice Giffard, in 1870. 5 Ch. App. 538. The lord chancellor, in his judgment, after holding, that, if the necessary effect of an instrument is to defeat, hinder or delay creditors, that necessary effect must be considered as

evidencing the intention to do so, whatever view may be taken as to what was actually passing in the mind of the maker of the instrument, says, that, in the case of Spirett v. Willows, there was direct and positive evidence of an intention to defraud, independently of the consequences which followed, or which might have been expected to follow, from the act. He adds: "But, it is established by the authorities, that, in the absence of any such direct proof of intention, if a person owing debts makes a settlement which subtracts, from the property which is the proper fund for the payment of those debts, an amount without which the debts cannot be paid, then, since it is the necessary consequence of the settlement (supposing it effectual), that some creditors must remain unpaid, it would be the duty of the judge to direct the jury that they must infer the intent of the settlor to have been to defeat or delay his creditors, and that the case is within the statute." He then refers to what he speaks of as the dicta of Lord Westbury in the case of Spirett v. Willows, and especially points out the following remark of Lord Westbury's as a dictum: "If the debt of the creditor by whom the voluntary settlement is impeached existed at the date of the settlement, and it is shown that the remedy of the creditor is defeated or delayed by the existence of the settlement, it is immaterial whether the debtor was or was not solvent after making the settlement." In regard to this dictum he says: "This expression of opinion on the part of the lord chancellor was by no means necessary for the decision of the case before him, where the settlor was guilty of a plain and manifest fraud. It is expressed in very large terms, probably too large; but it is unnecessary to resort to it in the present case." He then holds that the decree of Vice-Chancellor James was right, on the ground that, irrespective of the question whether there was an actual intention to delay creditors, the facts were such as to show that the necessary consequence of what was done was to delay them. In the same case, Lord Justice Giffard says, that the propositions laid down in Spirett v. Willows, taken as abstract propositions, go too far and beyond what the law is. In respect to voluntary settlements, he says that an intent to defeat creditors may be inferred in a variety of ways. "For instance, if, after deducting the property which is the subject of the voluntary settlement, sufficient available assets are not left for the payment of the settlor's debts, then the law infers intent, and it would be the duty of a judge, in leaving the case to the jury, to tell the jury that they must presume that that was the intent. Again, if, at the date of the settlement, the person making the settlement was not in a position actually to pay his creditors, the law would infer that he intended, by making the voluntary settlement, to defeat and delay them."

It is, therefore, quite clear, that nothing in the case of Spirett v. Willows changes the settled view held in England and the United States prior to that case, as to the proper construction of the statute of 13 Elizabeth.

The statute of New-York (2 Rev. St. p. 137, § 1), declaring conveyances of, and charges upon, property, made with the intent to hinder, delay or defraud creditors, to be void as against the persons so hindered, delayed or defrauded, is, in substance, the same, in its provisions, as the first section of the statute of 13 Eliz. c. 5. The statute of New York also contains the provision (2 Rev. St. p. 137, § 4), that the question of such fraudulent intent shall, in all cases, be deemed a question of fact, and not of law, and that no conveyance or charge shall be adjudged fraudulent as against creditors or purchasers, solely on the ground that it was not founded on a valuable consideration.

James K. Place, the settlor, was, for several years prior to December 1st, 1865, in a prosperous business, in the city of New York, as a member of the mercantile house of J. K. & E. B. Place, in which he and Ephraim B. Place were the only general partners, and James D. Sparkman was the sole special partner. The copartnership had, by its terms, on the 30th of November, 1865, some time yet to run. In the summer of 1865, James K. Place, being at the time prosperous in business and free from embarrassment, and abundantly solvent, determined to make a settlement on his wife, of a house for a residence. In pursuance of that purpose, he purchased, for the sum of $5,000, a ground-rent lease of a lot of land on the northwesterly corner of Forty-Seventh street and the Fifth avenue, in the city of New York, in size twenty-five feet by one hundred feet. He paid $500 of the purchase money on the 13th of July, 1865, and the remainder on the 18th of September, 1865. The holder of the lease assigned it to James K. Place, by an instrument dated June 21st, 1865, and recorded September 19th, 1865. Place immediately commenced the erection of a house on the lot, making, for the purpose, prior to the 2d of November, 1865, written contracts with various persons to do various parts of the work and furnish the materials therefor, payments for the work and materials to be made by instalments, as the work progressed to defined points. The house was completed about September, 1866. The affixing of materials and of the results of labor to the premises, in the shape of the house, kept ahead of the payments made therefor by James K. Place, the accretion to the land being at the rate of from $7,000 to $8,000 a month during the year from September, 1865, to September, 1866.

On the 30th of November, 1865, the firm of J. K. & E. B. Place was dissolved, by the mutual consent of its general and special partners. E. B. Place retired from business, and James K. Place and James D. Sparkman formed, as general partners, on the 1st of

December, 1865, a copartnership under the firm name of J. K. Place & Co., for the purpose of continuing the business of J. K. & E. B. Place. The firm of J. K. & E. B. Place had been prosperous. At its dissolution, November 30th, 1865, its accounts were adjusted after being stated, and the balance of its assets, after allowing for the payment of its debts, was divided among the members of the firm, by carrying to the credit of each member his proper share. Such share of James K. Place was, on that day, $227,301 62, and such share of James D. Sparkman was $262,719 45. These sums, in the shape in which they were so credited, being in the shape of assets of J. K. & E. B. Place, were put by James K. Place and James D. Sparkman, as capital, into the new firm of J. K. Place & Co., and amounted to more than $490,000. J. K. Place & Co. took, as purchasers, the stock of goods which J. K. & E. B. Place had on hand, and continued the same description of business at the same store. J. K. Place & Co. collected the receivables of J. K. & E. B. Place, and with the proceeds liquidated the debts due by J. K. & E. B. Place. Such debts amounted to over $3,800,000. All of them, except debts to the amount of some thirty to thirty-five thousand dollars, were paid within from sixty to ninety days after the 30th of November, 1865, J. K. Place & Co. having collected about ninety-eight per cent. of the debts due to J. K. & E. B. Place. There is no evidence that, at the time of forming the new firm of J. K. Place & Co., December 1st, 1865, James K. Place had any intention of doing anything else in respect to his own future business, or the business of such new firm, except to continue the prosperous business which the old firm of J. K. & E. B. Place enjoyed, or to embark in any hazardous enterprises or speculations, and there is no evidence to show that he had any reason to suppose that the new firm would not be as successful as the old firm had proved itself to be.

On the 18th of April, 1866, two instruments of assignment of the lease so assigned to James K. Place, were acknowledged and recorded in the proper recording office. One was an assignment of such lease by James K. Place to Alexander H. Wallis, and was dated November 30th, 1865. Mr. Wallis was the legal adviser of James K. Place. The other instrument was an assignment of such lease by Mr. Wallis to Susan A. Place, the wife of James K. Place, and was dated December 1st, 1865.

On the making, on the 13th of July, 1865, of the first payment, $500, on account of the assignment of the lease, an account was opened, in a book kept by J. K. & E. B. Place, as a book of that firm, which account was headed: "Fifth avenue, cor. 47th St., J. K. Place." This account was continued as the same account, under the same heading, in such book, so long as the firm of J. K. & E. B. Place continued, and, after that, the same book being kept by J. K. Place & Co., as a book of that firm, the account was continued as the same account, in the same book, under the same heading. To this account were debited all payments made on account of the purchase of the lease and the building of the house. The first item debited in such account was the $500 paid on account of the lease, July 13th, 1865, and it was entered as of that date. The amount of the items debited in such account to and including November 30th, 1865, were $10,028 35; to and including December 31st, 1865, $11,774 44; to and including December 31st, 1866, $51,627 00; to and including April 30th, 1867, $82,547 08; and to and including November 20th, 1867, $95,533 04. The amount of the items so debited during the year 1865 was $11,774 44; during the year 1866, $49,852 56; during the time in the year 1867 which preceded the 1st of May, 1867, $20,920 08; and during the time in the year 1867 which succeeded the 30th of April, 1867, and preceded the 21st of November, 1867, $12,985 96. By the 1st of December, 1865, $25,000 had been expended on account of the property, although only $10,028 35 had been debited to the account.

In regard to the furniture in the Fifth avenue house, some of it belonged to Mrs. Place, having been given to her by her father a number of years before 1866. The rest of it was procured during 1866, the order for the making of a large part of it having been given in June, 1866. It was paid for by Mr. Place as a part of the settlement on his wife, having been ordered and purchased by Mrs. Place, in her own name.

After the completion of the house and the procuring of the furniture, Mr. and Mrs. Place moved into the house and occupied it with their family.

The business of the firm of J. K. Place & Co. was, at first, very profitable. During the year 1866, and after April or May in that year, it sustained some losses, but its losses were not ascertained until December 31st, 1866, when they amounted, up to that time, to about $175,000. By that time the labor and materials which went into the house had been, all of them, substantially put into it as between the settlor and the settlee, and the furniture had been procured. The business of the firm went on, however, and it did not fail until November 20th, 1867, although by May, 1867, there was reason to think it would become insolvent.

I cannot regard the investment in the house and lease, and in the furniture, as an investment of the funds of the partnership for account of the partnership. The expenditures were, in effect, charged to James K. Place, with the assent of his partner, and the money was, in effect, drawn by him from the firm and applied to such expenditures, as between him and his partner, and with such partner's assent. The transaction of the purchase of the lease and the building of the house was an open and not a secret one,

and all the moneys applied to the purpose and to purchasing the furniture were debited on the books of the firm in an account headed with the designation of the property, and with the name of James K. Place. This was, to all intents and purposes, an individual account of Place's, kept in that shape for the sake of convenience. All of his private accounts, with few exceptions, were kept in the same way, in the books of the firm.

Within the principles settled in the cases before referred to, James K. Place was solvent and pecuniarily in a condition to make the settlement he made. It was not unreasonable in amount, and, after he made it, he still had abundant property left to pay the debts which he owed. Whether the assignment of the lease to Mrs. Place be regarded as having been made December 1st, 1865, or April 18th, 1866, is of no consequence. On all the evidence, the settlement was a competent one, whether either of those dates be taken as the date of the execution and delivery of the assignment to Mrs. Place. I see no evidence of any intent on the part of Mr. Place to defraud his then existing °creditors, or to divest himself of his property and embark in a new and hazardous business, and defraud subsequent creditors. The case is not at all like the cases of Savage v. Murphy, 34 N. Y. 508, and Case v. Phelps, 39 N. Y. 164, so strongly relied on by the plaintiff. In the former case, the court found that the settlor stripped himself of the title to all his property, by transfer to his wife and children, without any visible change of possession, and with the intent to contract and continue a future indebtedness in his business, on the credit of his apparent ownership of the property transferred. In Case v. Phelps the deed of conveyance was not put on record, there was no apparent change of ownership, and the creditor trusted him on the belief that he still owned the premises.

The evidence in the present case is very voluminous. The discussions of the case have been thorough and exhaustive, both orally and on paper. I have bestowed upon its consideration much care and time. I consented to a reargument of the case as respected the Fifth avenue property and the furniture, because of the large amount involved, of the importance of the principles and questions raised and debated, and of the apparent apprehension on the part of the plaintiff's counsel that he had not, on the first hearing, presented the case to the court in the light in which it ought to have been and might have been presented. I have considered fully all the views presented by the plaintiff's counsel in all his briefs, and, if I have confined what I have hereinbefore said to the salient and prominent features of the case, it is not because I have failed to pass upon every view urged on the part of the plaintiff, but because there are certain controlling features which, under the law as I understand it, must govern the disposition of

the case, and because a detailed discussion of every point of law and fact urged on the part of the plaintiff would swell this opinion to an undesirable length. The result I have arrived at is one which I am thoroughly satisfied is correct, but I have the satisfaction of knowing, that, if I have committed an error, it can be corrected by an appellate tribunal.

[The decision in this case was reversed by the circuit court, upon appeal by complainants. Case No. 12,621.]